UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **CALANDRA REVERING**,<br><br>Plaintiff,<br><br>vs.<br><br>**VOLUNTEERS OF AMERICA OF MINNESOTA AND WISCONSIN (FORMERLY KNOWN AS VOLUNTEERS OF AMERICA OF MINNESOTA) AND VOLUNTEERS OF AMERICA IN MINNESOTA**<br><br>Defendants. | Court File No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Calandra Revering, for her complaint against Volunteers of American of Minnesota and Wisconsin (formerly known as, Volunteers of America of Minnesota) and Volunteers of America in Minnesota, states and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under Title 28, United States Code, Sections 1331, 1343, 2201, and 2202; and the Civil Rights Act of 1964, Title 42, United States Code, Section 2000e *et seq.*, as amended by the Civil Rights Act of 1991. This Court also has supplemental jurisdiction over plaintiff's state claims pursuant to Title 28, United States code, Section 1367.

2.      Venue is proper in the District of Minnesota because the unlawful practices described hereinafter were committed in in the State of Minnesota and Defendant maintains its offices, conducts business, and has its primary place of business in Edina, Minnesota pursuant to 28 U.S.C. 1391.

## PROCEDURAL HISTORY

3.      Plaintiff has satisfied all of the procedural requirements applicable to this action. Plaintiff has filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission and has received a right to sue letter.

## PARTIES

4.      Plaintiff Calandra Revering ("Plaintiff or Revering") is African-American. And at all times relevant hereto was employed with Volunteers of America of Minnesota, Inc.

5.      Defendant Volunteers of America of Minnesota and Wisconsin (formerly known as, Volunteers of America of Minnesota) and Volunteers of America in Minnesota (collectively "VOAMN"), is a not-for-profit corporation with its principal place of business in Minnesota.

## FACTUAL ALLEGATIONS

6.      Revering is an African-American female who worked for VOAMN for five years

7.      VOAMN hired Revering in March 2010.  Revering was hired by VOAMN as a Senior Manager for Contracts.

8.      Revering's responsibilities and duties included contract negotiations, compliance, interactions between agencies and vendors and drafting settlement agreements and leases.  Revering was also responsible for executing purchase orders, not to exceed $5,000.00.

9.      During her interview in January 2010 Revering disclosed to Robert Lovegrove ("Lovegrove") that her law license was suspended at that time.  Revering's license was reinstated.

10. Revering's responsibilities increased when her license was reinstated in November 2010. VOAMN paid for Revering's law license registration each year after her reinstatement. Following reinstatement of her license, Revering assisted VOAMN's attorneys and insurance companies by analyzing court orders and acquisition documents. Revering corresponded with the Internal Revenue Service on behalf of VOAMN. Revering created a federal indirect cost rate that VOAMN currently uses. This proposal and formula allows VOAMN to earn a larger percentage on federal and state approved contracts.

11. Jim Bettendorf, Vice President of Services suggested to VOAMN's programs that they could take legal inquiries to Revering as it would be cost effective compared to retaining outside counsel. VOAMN's program's units brought legal matters to Revering.

**VOAMN PAID FOR REVERING'S CLE COURSES**

12. Revering took continuing legal education ("CLE") courses during her *entire* tenure at VOAMN. Lovegrove approved purchase orders for Revering to attend CLEs. At some point, Lovegrove told Revering that it was not necessary for her to continue to send the purchase orders to him for his signature because she was already approved to sign purchase orders up to $5,000.00. From that point forward, if Revering took a CLE, she would complete a purchase order, sign it, attach the registration form and agenda together, and give it to Nicole White ("White"), VOAMN's accounts payable clerk for approval.

13. Revering would share with the accounting department each week relevant CLE information or inform the group which CLEs she was scheduled to take in order to get input from other workers.

14. In 2013, VOAMN encountered larger than normal overhead expenses within the organization. In a communication dated December 30, 2013, Paula Hart ("Hart"), President and CEO of VOAMN, issued a directive via email to the entire organization requesting employees to

seek pre-approval for all discretionary spending.  On Monday, January 6, 2014 substantial layoffs occurred ranging from senior management to front line employees.

15.     As a result of this directive, VOAMN's approval process for payment of purchase orders was modified to include several steps.  Nicole White, accounts payable clerk, would place purchase order details onto a spreadsheet disclosing the identity of the vendor, the amount of the purchase order, and the program responsible for the expense.  Next, the Vice President of Finance would review the spreadsheet and instruct White which expenses were approved.  Approved purchase orders were paid via check from VOAMN.  This process of payment approval for purchase orders remained in place from December 30, 2013 until Revering's unjust termination.

16.     VOAMN had additional stop gaps in place too.  Accounts payable or a controller would review all printed checks and match them with the approved purchase order before the checks were disbursed.  Monthly financial statements were sent to program directors and vice presidents for their review.  This allowed directors and vice presidents to compare expenses against their budgets.  If any anomalous expenditures occurred, they could be addressed.  The Vice President of Finance also had the opportunity to request review of questionable expense, which was frequently done.  Even CEO Hart received expenditures submitted for payment and provided approval.

17.     The expense reimbursement process was similar.  An employee would complete a reimbursement form, sign it and submit it to his/her respective supervisor for signature.  Once the supervisor signed the reimbursement form it was submitted to White.  Without, a supervisor's signature, i.e. approval, payment would not be made.  VOAMN employees cannot approve their own reimbursements.

18.     At all times, Revering's CLEs were approved by VOAMN.

## **VOAMN RETALIATED AGAINST REVERING**

19.     On or about March 2014, VOAMN hired Athena Mihas ("Mihas") as the Vice President of Finance. Mihas encountered team members who were upset regarding VOAMN's RIF.  During a meeting Mihas asked the team how they were coping and after much prodding and assurance that comments would remain in the room, Revering told Mihas she was concerned about the way Mihas handled a meeting with a grant manager who was conducting an audit.

20.     Mihas immediately shut the conversation down.

21.     A week prior, an auditor named Jasmine Milner ("Milner") from Washington D.C. met with Revering and other program participants.  Milner was present to train Revering on the federal invoicing and reporting procedures for the Experience Corp/Department of Justice Grant.  At the time, Revering had sole responsibility for this grant.  At some point, the entire group split up leaving Milner with Revering and Mihas.  During the training Milner requested documents from Revering.  When Revering went to retrieve the documents, Mihas closed the door and remained in the meeting with Milner.

22.     Later, Revering learned that Mihas closed the door to request a private training on the grant reporting process.  Revering immediately thought it odd because Mihas was not responsible for the grant, Revering was.  Ultimately, Revering was never trained on federal invoicing and reporting procedures related to the grant.

23.     The day after Revering shared her concerns at the meeting, the entire accounting management team was called to a conference room to meet with CEO Hart.  Hart requested that Revering repeat her concerns.  Revering did as instructed.  Hart suggested Revering and Mihas meet with Lorie Humphrey ("Humphrey"), Vice President of Human Resources.  Both declined.

24.     Revering and Mihas did meet alone.  Mihas told Revering she would take over the reporting and invoicing of the Experience Corp/Department of Justice Grant.  VOAMN eventually lost the grant.

25.     On July 29, 2014, Revering complained to Mihas about a white male co-worker who she believed was racist.  This particular co-worker, John Kehr ("Kehr") refused to provide contracts to Revering for her review, despite the fact that it was her job to review contracts.  During an exchange of emails about a request for assistance, Revering consulted with Mihas regarding Kehr's behavior and tone in the emails.  Mihas instructed Revering to reply to the email letting him know that both Mihas and Revering were available to assist him.

26.     Four days later, Revering met with Humphrey and Mihas and was told a written warning about her email exchange with Kehr was being placed in her personnel file.  Kehr had complained to Mihas that Revering was unprofessional with him doing their email encounters.  Mihas prepared a two-page memorandum discussing Revering's professionalism.  Revering stated that she disagreed with the write up and questioned whether it had to do with her complaint about Kehr being racist.  Revering also informed Humphrey and Mihas that she would be filing a complaint with Department of Human Rights.

27.     Humphrey was not aware that Revering made a complaint to Mihas regarding Kehr's behavior toward people of color.  Mihas stated that she had not informed Humphrey about Revering's complaint because she did not think Revering was serious.

28.     Two days later, Mihas told Revering she would remove the written warning from Revering's personnel file.  However, Mihas never removed the written warning, instead she added a document referencing a counseling session.  Revering's personnel file appeared to have two disciplinary actions.

6

29.     After the write up, VOAMN hired Therese Pautz, an employment investigator from NeuVest whose investigation resulted in no evidence of discrimination.  On October 22, 2014, Revering met with Humphrey and CEO Hart regarding the investigations results.  Hart shared with Mihas the report conducted by NeuVest.  On October 27, 2014, Mihas sent Revering an email informing her that the program staff would take over the reporting and compliance pieces of her job.  This consisted of over 60% of Revering's duties and obligations at work.  Additionally, Mihas requested weekly one-on-one meetings with Revering, which had never previously been done by Mihas or Revering's previous supervisors.

### VOAMN CONTINUED TO RETALIATE AGAINST REVERING AFTER SHE REPORTED A CO-WORKER'S RACIST COMMENTS

30.     On January 15, 2015 Revering reported unprofessional conduct of a co-worker, Ann O'Hara ("O'Hara)—VOAMN's Controller, whose behavior was notably disruptive.  O'Hara is a white female.  O'Hara was close friends with Mihas.  Mihas asked Revering if she would like her (Mihas) to mediate a conversation between Revering and O'Hara, but Revering declined.  Notably, a mediation was not offered to Revering when she complained about Kehr.  In fact, Revering received a write up.

31.     A week later, at Revering's weekly one-on-one meeting with Mihas, Revering informed Mihas that her CLE reporting year was fast approaching and she would need to obtain 45 credits.  Revering suggested purchasing a CLE super pass to reduce costs and expenses to VOAMN.  Mihas consented. During this discussion, Revering was informed by Mihas that a task force had been assembled to restructure Revering's job, and that she would be contacted by one of the task force members about her new job duties.

32.     Each year VOAMN's auditors, Clifton Larson Allen, hosts a conference ("CLA Conference").  Each year all the financial managers attended and VOAMN paid for their

attendance. In 2014, Mihas registered all finance managers for the conference, including Revering. In 2015, after Revering complained about Mihas and O'Hara's unprofessional behavior, Mihas failed to provide Revering information regarding the annual CLA Conference. Mihas did not notify or register Revering for the conference.

33. Mihas registered herself and Julie Rumpel ("Rumpel"), Senior Manager of Accounting for the CLA Conference. Mihas also registered O'Hara. O'Hara and Rumple are white females. Mihas registered herself, Rumpel, and O'Hara a month prior to the CLA Conference. Revering learned from Rumpel two (2) days before the conference that they (all white female co-workers) were registered.

34. When Revering learned of this, she asked Mihas why she excluded the three African American female financial managers as Revering, Edwina Bruce, and Lufelia Addison were not notified or invited to the CLA Conference, even after repeated inquiries. Revering specifically asked if the finances were an issue, and Mihas immediately said no. Revering believes this was done purposely because Revering took part in the investigation conducted by NeuVest, Revering expressed filing a complaint with the Minnesota Department of Human Rights and because she complained about unprofessional behavior by O'Hara. Mihas knew that without the updated audit information, Revering could not effectively do her job, and Mihas was currently involved in restructuring Revering's job duties.

35. Mihas then went to each of the three African-American females and asked if they wanted to attend. Revering informed Mihas that she wished to attend. At the start of the CLA Conference, Mihas texted Revering to inquire of her whereabouts. Revering was seated behind Mihas. Mihas did not text any other employee regarding their whereabouts.

36. On May 7, 2015, Revering met with Humphrey to report statements O'Hara made to the African American financial managers. Specifically, Revering reported to Humphrey that O'Hara, without provocation, went into Revering's office and told Revering her sister went to a plantation where "real slaves were talking." O'Hara then said, "real slaves exist today." Revering also informed Humphrey that the three African-American finance managers were not initially invited to the CLA Conference. Revering also reported to Humphrey how her complaint about O'Hara was treated differently than Kehr's complaint about her. In other words, O'Hara was given an opportunity to apologize, but Revering was written up.

37. The next week, Mihas, Humphrey, and O'Hara met to discuss O'Hara's comments. Days later, managers in the accounting department received an email that O'Hara was not returning. That Friday, Revering received a call from Humphrey to complete a manager survey. Revering was reluctant to complete the survey. Humphrey told Revering that no one would know who the survey was from. Humphrey asked Revering to complete the survey by 4 p.m.

## **REVERING'S TERMINATION WAS RETALIATORY**

38. Allegedly, O'Hara was terminated on May 18, 2015. Two days later, on May 20, 2015, Mihas requested Revering's presence at a local coffee shop. When Revering arrived, she was met with Mihas and Humphrey. At the meeting, Revering was told she was being placed on paid leave due to inaccuracies in the budget. Revering was told a forensic accountant was going to be called in and the forensic accountant would contact her.

39. Prior to being placed on leave, Revering informed VOAMN that she was overpaid. While Revering was on leave, VOAMN drafted a document alleging that Mihas discovered the overpayment on Revering's check. VOAMN presented this document to Deb Mau ("Mau"), benefits manager for her approval. Mau refused to sign the document and informed VOAMN that she repeatedly told Mihas that it was Revering that brought the overpayment to VOAMN's

attention, Mihas' calculation was miscalculated, and that Revering had presented the actual calculation.  VOAMN reluctantly corrected the document.

40. While on leave, Revering learned from a VOAMN employee that O'Hara and Mihas were observed on a Saturday in VOAMN's building after O'Hara was terminated, but before Revering was put on leave.  O'Hara and Mihas were both going through file cabinets in the accounting department.

41. Revering filed a complaint with the Minneapolis Department of Civil Rights ("MDCR") while on leave.  VOAMN was served with a complaint and did not file an answer.  Prior to the due date of VOAMN's response to the complaint of retaliation, VOAMN challenged jurisdiction.  MDCR contacted Revering and suggested that she withdraw her complaint, file with the Minnesota Department of Human Rights, and that they would notify VOAMN. When MDCR notified VOAMN of the complaint, VOAMN terminated Revering.

42. VOAMN terminated Revering in July 2015 after a forensic investigation was conducted by Schechter Dokken Kanter ("SDK").  This investigation disclosed discretionary transactions totaling $6,875.92.  SDK even pulled a transaction that VOAMN still pays today for the function of one of their programs, alleging the transaction was for Revering's benefit.  The transactions for CLEs were for the benefit of VOAMN as Revering was using her legal skills to assist the organization.  Revering disclosed all CLE expenses as part of the approval process.  VOAMN implemented a drivel "investigation" whereby Revering was the sole violator subjected to termination.  Notably, all the expenses reviewed by SDK incurred during the time O'Hara was employed with VOAMN.  This investigation was pretext for discrimination.

43. During the "investigation" Edwina Bruce ("Bruce"), Manager of Payroll and Accounts Payable received a telephone call from Mihas.  Mihas told Bruce "the investigator may want to talk

to you regarding our P.O. process, but don't provide any answers. Direct them back to me." Mihas then said, "I'm sorry to have to ask you to do this, but this is coming from upstairs." Refusing to participate in VOAMN's fraudulent behavior, Bruce went out on leave. Nicole White, data entry clerk, was then subjected to hours of questioning by SDK regarding the P.O. process in the absence of Bruce, and maintained that the process was followed correctly by Revering.

**COUNT I**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
AS AMENDED 42 U.S.C. §2000e, et seq.
(RACE DISCRIMINATION)**

44. Revering restates and realleges the foregoing paragraphs as though fully set forth herein.

45. VOAMN, through its agents, discriminated against Revering in the terms and conditions of her employment because of her race in violation of Title VII.

46. VOAMN, through its agents, diluted Revering's work load and responsibilities. No other individual was subjected to this disparate treatment. VOAMN punished Revering for complaining about other co-workers' racist behavior. Ultimately, VOAMN's racially-motivated assumptions and actions precipitated its discriminatory decision to terminate Revering.

47. By reason of VOAMN's discriminatory and unlawful practices described above, Revering has suffered discrimination, embarrassment, emotional distress, humiliation, loss and indignity.

48. Revering is entitled to recover all amounts owing under Title VII, including liquidated damages for VOAMN's violation of these laws. She is entitled to such legal and equitable relief, including damages for mental anguish, punitive damages and compensation for past and future loss of wages and employment benefits as may be appropriate under Title VII.

## COUNT II

### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED 42 U.S.C. §2000e, et seq. (RETALIATION DISCRIMINATION)

49. Revering restates and realleges the foregoing paragraphs as though fully set forth herein.

50. Under 42 U.S.C. §2000e, it is "an unlawful practice for an employer to discriminate against any of his employees or applicants for employment…because he has opposed any practice made an unlawful employment practice by [42 U.S.C. Chapter 21, Subchapter VI], or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. Chapter 21, Subchapter VI]."

51. VOAMN's conduct described herein violates 42 U.S.C. § 2000e-3(a).

52. As a result of VOAMN's violation of 42 U.S.C. § 2000e-3(a), Revering has suffered past and present loss of income, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other damages in an amount in excess of $75,000.00. Plaintiff is also entitled to attorney's fees and costs incurred in connection with this claim.

53. VOAMN committed the above-alleged acts with malice or reckless indifference to the federally protected rights of Revering. As a result, Revering is entitled to punitive damages.

## COUNT III

### VIOLAION OF 42 U.S.C. SECTION 1981 (RETALIATION)

54. Plaintiff restates and realleges the foregoing paragraphs as though fully set forth herein.

55. VOMAN's actions against Plaintiff were retaliatory against her for opposing the discriminatory conduct, all constituted illegal discrimination and interference with Revering's rights and contract based on Plaintiff's complaints.

56. The interference with Revering's employment rights and contract based on her opposing VOAMN's discriminatory conduct violates 42 U.S.C. Section 1981.

57. As a result of VOAMN's violation of 42 U.S.C. Section 1981, Revering has suffered past and present loss of income, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and other damages in an amount in excess of $75,000.00. Plaintiff is also entitled to attorney's fees and costs incurred in connection with this claim.

## JURY DEMAND

58. The Plaintiff hereby requests a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

1. That the practices of defendant complained herein be adjudged in violation of the rights secured by Plaintiff by Title VII, 42 U.S.C. 2000e *et seq.*, as amended.

2. That Plaintiff be awarded compensatory damages in an amount to be established at trial.

3. That Plaintiff be awarded damages for mental anguish and pain and suffering in an amount to be established at trial.

4. That the Court grant Plaintiff her attorney's fees and the costs and expenses of this action.

5. That the Court grant such other and further relief as the Court may deem just and equitable in the premises.

Dated:  January 27, 2017                    *The Law Firm of Sellano L. Simmons, PLLC*

*s/Sellano L. Simmons*
Sellano L. Simmons #0387026
503 D Street, Suite 300
Washington, D.C. 20001
Telephone: (240) 485-6106

ATTORNEY FOR PLAINTIFF